UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MARTIN S. GRANOFF, AS TRUSTEE OF THE GRANOFF ACQUISITION TRUST, <br> *plaintiff,* <br><br> versus <br><br> BUOYANCE, INC., CECIL E. ROE-BUCK, LYDIA J. BREIGHNER, FLOAT NOLA LLC F/K/A FLOT NOLA LLC, IC FLOAT-CON LLC F/K/A IT FLOAT-CON LLC, THE FLOAT CONFER-ENCE LLC, RESET LLC, THE ROE-BUCK INSTITUTE LLC, BREIGHNER INSTITUTE LLC, AND INTERNA-TIONAL THERAPEUTIC FLOATA-TION CONFERENCE LLC, <br> *defendants.* | Civil Action No. 20- <br><br> Section          Division <br><br> District Judge <br><br> Magistrate Judge |

## COMPLAINT

Plaintiff supports its right to recover variously from these defendants with these allegations of law and fact:

### Nature of the case

1.    The plaintiff seeks damages it incurred, and enhanced damages and attorney's fees awardable, when it advanced considerable sums of money to certain defendants, ostensibly in return for the rights to installments on a promissory note given in a seller-financed sale of business assets which turned out to be a complete, criminal sham. The plaintiff also seeks to make other defendants liable under a group of com-

panies/single business enterprise theory, and also seeks Court orders regarding conveyances to third parties in violation of various states' prohibition(s) of fraudulent and improper conveyances designed to prejudice lawful creditors.

### Parties

2.   Plaintiff **Martin S. Granoff ("Granoff"), appearing as Trustee of the Granoff Acquisition Trust ("GAT")**, is a natural person of the full age of majority who keeps his domicile in Broward County, Florida. As GAT's active trustee, Granoff's control is sole, real, and substantial and he has full authority to seek this relief against these defendants.

3.   Named defendant is:

   a.   **Lydia J. Breighner ("Breighner")**, a natural person of the full age of majority who, upon information and belief, is domiciled and resides in Orleans Parish, Louisiana.

   b.   **Breighner Institute LLC ("Breighner Institute")**, a juridical person organized in and under the laws of the State of North Carolina. Before it was administratively dissolved in October 2019, Breighner Institute had two members (co-defendants Breighner and Roebuck) and a registered office in Mecklenburg County, North Carolina.

   c.   **Buoyance, Inc. ("Buoyance")**, a juridical person incorporated in and under the laws of the State of North Carolina. Before it was administratively-dissolved in June 2019, Buoyance's principal place of business was in Mecklenburg County, North Carolina.

   d.   **The Float Conference LLC ("Float Conference")**, a juridical person organized in and under the laws of the State of North Carolina. Before it was administratively dissolved in October 2019, Float Conference had a single member (co-defendant Roebuck) and registered offices in Mecklenburg County, North Carolina and East Baton Rouge Parish, Louisiana.

   e.   **Float Nola LLC ("Float Nola")**, a juridical person organized in and under the laws of the State of Louisiana which, upon information and belief, has a single member (co-defendant Roebuck) and a registered office in Orleans Parish,

Louisiana. Until an April 2020 name change, Float Nola was known as Flot Nola LLC.

f.   **IC Float-Con LLC ("IC Float-Con")**, a juridical person organized in and under the laws of the State of Louisiana which, upon information and belief, has a single member (co-defendant Roebuck) and a registered office in Orleans Parish, Louisiana. Until an August 2018 name change, IC Float-Con was known as IT Float-Con LLC.

g.   **International Therapeutic Floatation Conference LLC ("ITFC")**, a juridical person organized in and under the laws of the State of Louisiana which, upon information and belief, has a single member (co-defendant Roebuck) and a registered office in Orleans Parish, Louisiana.

h.   **Reset LLC ("Reset")**, a juridical person organized in and under the laws of the State of Louisiana which, upon information and belief, has a single member (co-defendant Breighner) and a registered office in Orleans Parish, Louisiana.

i.   **Cecil E. Roebuck ("Roebuck")**, a natural person of the full age of majority who, upon information and belief, is domiciled and resides in Orleans Parish, Louisiana.

j.   **The Roebuck Institute LLC ("Roebuck Institute")**, a juridical person organized in and under the laws of the State of North Carolina. Before it was administratively dissolved in October 2019, Roebuck Institute had a single member (co-defendant Roebuck) and a registered office in Mecklenburg County, North Carolina.

### Jurisdiction

4.   The Court may exercise original jurisdiction over the subject matter of GAT's civil claims under 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and because the parties are completely diverse: the plaintiff is a Florida citizen and no defendant is a Florida citizen.

## Venue

5.    GAT's claims should be heard in this Court under 28 U.S.C. § 1391(b)(2) venue principles because a substantial part of the events or omissions giving rise to GAT's claims occurred, and a substantial part of property that is the subject of the action is situated in, this judicial district.

## Martin Granoff; Granoff Acquisition Trust

6.    Since the early 80s Martin Granoff has been raising equity and debt capital for new and existing business ventures. In the early 90's, Granoff expanded and began acquiring seller-financed business notes. Word spread and today, in the business context,[1] Granoff's companies purchase (fully or partially) cash flow from seller-financed business notes, royalty streams, partnership buyouts payable over time, schools' future interest in tuition payments, and many other cash flows payable over time where the payees have a real interest in immediate access to a lump-sum, provided Granoff can properly vet the note payor.

7.    Granoff's purchases range from the simple to the complex and a few years ago, Granoff's companies purchased future judgment proceeds due from Syria, which proceeds were eligible for payment from the United States Victims of State Sponsored Terrorism Fund.

8.    Granoff and his businesses are highly regarded as lump sum payout specialists with a solid reputation and a long list of loyal clients including attorneys, accountants,

---

[1] Including contest winnings payable over time including state lotteries (in the early 90s many states didn't have a lump sum option and Granoff's companies were the "go-to" source for lump-sum money), television game show winners, hole-in-one golf prizes, manufacturers' and retailers' contests, restaurant contests, casino prizes (mainly big prize payout slot machine wins).

financial advisors, cash flow brokers, and other professionals serving those with future payments due to them from various sources.

9.   The transaction at issue in this case involved GAT (Granoff Acquisition Trust) and Granoff is its trustee.

## A schematic

10.   This case is about GAT's purchase of $250,000 worth of note payments. The note ("*First Float Note*") was given as part of a seller-financed transaction where defendant Buoyance sold North Carolina company First Float LLC all its business assets so First Float could run a float[2] and associated services[3] spa (where Buoyance had) in an upscale suburb of Charlotte.

---

[2] Float spas make use of isolation tank, often referred to as a sensory deprivation tank (also known as float tank, float pod, float cabin, flotation tank, or sensory attenuation tank), which is a pitch-black, light-proof, soundproof environment heated to the same temperature as the skin. Flotation tanks are widely advertised as a form of alternative medicine, but beneficial health effects are unproven. The tank is filled with 10 inches of water which contains enough dissolved Epsom salt to create a specific gravity of approximately 1.275. This environment allows an individual to float effortlessly on the surface of the water. The primary function of the isolation tank is to eliminate as many of the external senses as possible. They were first used in 1954 to test the effects of sensory deprivation. Associated "halotherapy" (also known as

speleotherapy) is a form of alternative medicine which makes use of salt. Halotherapy is an unproven treatment that lacks scientific credibility. Spa owners attribute a wide range of health benefits to halotherapy. Though spa use has reportedly been used for millennia (back to 12th Century Poland, in which people were urged to bathe in mineral waters), modern history of halotherapy dates only to 1843, when a Polish physician named Feliks Boczkowski promoted the idea of salt treatment after noticing that workers at a salt mines, unlike other miners, did not have respiratory or lung problems.

[3] Acupuncture, massage, skincare, body rituals, sauna, and oxygen bar.

11.     The diagram  below provides a basic overview of the transactions at play, each of

which will be detailed in allegations that follow:



**First Float/Buoyance sale;**
***First Float Note***

12.    In the months leading up to January 31, 2018, non-party First Float LLC ("First Float") and defendant Buoyance negotiated terms where First Float would purchase Buoyance's business assets so it could continue to operate a float spa in Huntersville, a lakeside suburb of Charlotte, North Carolina.

13.    On or about January 31, 2018, First Float and Buoyance entered into an *Asset Purchase Agreement* and a *Bill of Sale and Blanket Assignment* (collectively "Buoyance Sale Docs") to sell all Buoyance's assets. The agreements clarified that First Float would occupy the leased space where Buoyance did business earlier and its purchase was of substantially all Buoyance's business assets used for those purposes.

14.    According to the Buoyance Sale Docs and the representations made by Roebuck and Breighner in them, Buoyance's assets were considerable: spa equipment, client lists, current memberships, and other related assets necessary to operate a flotation therapy (and related services) spa, along with goodwill. Everything in the deal was assigned a dollar value.

15.    Upon information and belief, Roebuck and Breighner also repeatedly represented that the spa therapy business was in good financial health and that its assets had certain values and they specifically represented there were no undisclosed liabilities beyond those specifically referenced in the Buoyance Sale Docs.

16.    Besides the representations made in the Buoyance Sale Docs, Roebuck and Breighner gave First Float a "Confidential Memorandum" describing Buoyance's gross annual

revenue ($208,000), the book value of the assets to be conveyed ($307,000) and the value of its client list ($15,000).

### New Orleans

17.   The day after the sale, Breighner and Roebuck organized Float NOLA and, since then, all their businesses' activity (including Buoyance, who was under a noncompete with First Float) has been in the Greater New Orleans Metro Area.

### Roebuck and Breighner hawk the *First Float Note*

18.   Although First Float paid $200,000 cash at closing, Roebuck and Breighner knew it wouldn't be long before the *First Float Note* payments ceased – after all, they'd just sold $450,000 worth of snake oil.

19.   They needed to monetize the note stream before they were discovered and they shopped the *First Float Note* stream to note brokers, hoping to get a deeply-discounted lump sum now in return for the note payments they were due over the next several years.

20.   In late May 2018, Granoff was approached by a note broker with this to say about Breighner and Roebuck's note:

> Marty:
>
> I hope all is well with you. I know it has been a while since last we spoke. I am writing you in regards to a business note submission that you will find below.
>
> Here is a business note for sale secured by a Therapeutic Hydro Spa in the outer Charlotte, NC metro area. The seller is looking for a partial offer but is willing to consider a full as well.

**Cash Expectations of Seller**

The seller is wanting to generate about $120,000-$130,000 on a partial (24-36 month partial). The sellers are moving from NC to New Orleans this week and require funding.

I spoke to the seller already and he has a family attorney that would be willing to collect payments on your behalf at his expense. This note is also secured by a 2nd lien on the guarantors primary residence located at: 12010 Journeys End Trl, Huntersville, NC 28078. Unfortunately this is not as useful as the seller hoped for as the value of the property will max
around $275k (on the very high end) and the majority of the equity is encumbered by a 1st lien held by a local CU.

Attached is the full file and pay history. There are 4 guarantors and they all live under one roof. Please let me know if you have any questions.

**Business Information**

Exact Business Name: Buoyance Spa
Business Address: 16501 Northcross Drive, Suite B
City: Huntersville
State: North Carolina
Zip Code: 28078
Country: United States
Types of Business: Spa and Therapy
Business Operating as Franchise: No
Gross Annual Income: $250,000
Annual Business Expenses: $80,000
Net Operating Income: $170,000
Total Dollar Value of All Business Assets: $100,000
How Long in Business: 8 Years
How Long at Location: 3.5 Years
Business Location Is Leased By Borrower
Terms of Lease
Renewal Option(s): 2.5 years left on 5 year lease. Option to renew with a 3% increase.

**Sale Information**

Date of Sale: 01/31/2018
Sales Price: $450,000

Down Payment: $200,000

**Note Information**

Original Note Amount: $250,000
Position of Note: 1st
Current Note Balance Owed: $ 236,253.56
Interest Rate: 8%
Payment Amount: $5,069.10
Original Length: 60 Months
First Payment Date: 03/01/2018
Payment Frequency: Monthly
No. of Payments Made: 4
No. of Payments Remaining: 56
Next Payment Due Date: 07/01/2018
Are the Payments on Time: Yes
Was there a U.C.C Filed & Recorded: Yes
Balloon Payment Amount: N/A
Balloon Due Date:

**Borrower Information**

Borrower Type: Corporate Entity (LLC with Guarantors )
Borrower Name: First Float
Is there a Personal Guarantee: Yes
Did You Pull Credit on Borrower at the Time of Sale: Yes
Borrower Credit Rating: Low to Mid 600/s on All
Additional Comments on Transaction or Collateral: There is a lien on
the borrower personal property in 2nd position in 12010 Journey's End
Trail, Huntersville, NC 28078. 4 PGs. All guarantors live at same
home with lien

21.  After Granoff had lengthy discussions with Roebuck and Breighner about their New

Orleans plans, on July 14, 2018, GAT entered into an *Agreement for Partial Assign-

ment of Note Payments* ("*First Partial Assignment*") with Buoyance and its "family

attorney," Zachary Moretz.

22.  Under the *First Partial Assignment*, GAT would immediately advance $125,403 to

Buoyance in return for the first $4000 paid toward the next 48 *First Float Note*

payments.

23. Those payments would be made from First Float to attorney Moretz, who would act as a remitting agent, forwarding the payments to GAT.

24. Buoyance expressly agreed that GAT's identity would be kept from First Float and that, if First Float defaulted, it would pursue collection efforts as if the *First Partial Assignment* didn't exist.

### The payment stream; *Second Partial Assignment*

25. When Buoyance approached GAT, the *First Float Note* wasn't very old – First Float had made 4 payments of $5069.10 to Buoyance – and all on time.

26. Under the *First Partial Assignment*, GAT was entitled to monthly $4000 of that $5069.10 payment beginning August 1, 2018.

27. First Float made the payments, and Moretz forwarded them to GAT, for August 2018-December 2018.

28. Then, in late December 2018, GAT agreed to advance another $40,000 to Buoyance in return for the full monthly payment from First Float for 47 months (January 2019-November 2022)("*Second Partial Assignment*").

29. Under the *Second Partial Assignment*, Buoyance also promised a UCC security interest in otherwise-unencumbered equipment, including 3 new float tanks ($32,000 each), a new hydro tone spa tub ($42,000), 3 state of the art, new, heated, hydraulic, largest made massage tables ($8000 each), new facial equipment valued at $30,000, new apothecary furniture ($25,000), and new furniture ($32,000), all of which would be drawn up in a security agreement and UCC-1 financing statement prepared by Roebuck's Louisiana attorney.

30. GAT was paid its January 2019 – April 2019 stream payments as agreed.

31.   At no point did Breighner or Roebuck even hint that the sale of Buoyance's assets was a windfall, let alone that it stood on shaky ground because they'd misrepresented what was sold.

### Buoyance, Roebuck, and Breighner exposed

32.   Once First Float purchased Buoyance's assets and goodwill, it began operating as a floatation therapy center, providing wellness services to clients such as halo therapy, floatation therapy, massage therapy, and other therapy and wellness services and products from the location previously occupied by Buoyance.

33.   But almost everything Breighner and Roebuck said about Buoyance was false – and as Winter 2018 turned into Spring 2019, First Float began to realize:

a.   Roebuck and Breighner had vastly overstated the value of the business and assets. They'd also misrepresented the number of monthly memberships (*i.e.* recurring): many had been cancelled, causing First Float to refund fees to those clients. Before the Buoyance sale and during inspection and due diligence periods, Roebuck and Breighner actively concealed the true nature of the business and its assets, including the number of active memberships.

b.   One of Roebuck and Breighner's go-to shams was the "Groupon" scheme.[4] They'd sell discounted services in advance and then never perform them. This was the case where First Float was saddled with customers demanding services it would never be paid for, all of which was included in gross revenue reports and none of which was described as services still owed.

---

[4]   https://www.flotnolashop.com/shop/SALE/5 demonstrates they're still doing this, even without a studio or any permits.

c.     Roebuck and Breighner also concealed and/or misrepresented the value of equipment by misrepresenting and/or concealing the debts on assets. Contrary to promises made in the Buoyance Sale Docs, that there were no "undisclosed liabilities," the majority of the purchased business assets had outstanding debt on them.

d.     Other assets, such as credit card processing accounts, were in default or they were out of warranty and not eligible for repair, none of which was disclosed and much of which was affirmatively represented.

e.     The Buoyance Sale Docs and the due diligence period were fraught Breighner and Roebuck's repeated denial or outright lies about and concealment of debt First Float unwittingly purchased.

f.     Regulatory authorities contacted First Float: one of the treatment rooms and its equipment was not (and had never been) compliant with local health codes, and could not lawfully be used for its intended purpose.

g.     Buoyance and its owners also breached representations in the Buoyance Sale Docs which stated... "The financial statements, income tax filings, and accounts reflect the actual activity in Seller's business for the period covered by the financial statements, and full and accurate copies of all revenue statements have been provided to buyer." Upon information and belief, those financial statements and income tax filings provided were false and falsified, and had been submitted to the Internal Revenue Service.

h.     In addition, Buoyance, Roebuck, and Breighner repeatedly breached the Buoyance Sale Docs by refusing to transfer and assign to First Float the lease

for the premises where Buoyance had operated its business. This conduct flagrantly violated the Buoyance Sale Docs, which required "[s]eller shall reasonably cooperate with any request to assign the lease to Buyer..."

i.    Roebuck and Breighner wrongfully and tortiously interfered with the Buoyance Sale Docs by preventing Buoyance from transferring that lease to First Float. And Buoyance, Roebuck and Breighner refused to cooperate, and became belligerent in their refusal to cooperate, with the assignment of the lease to First Float. In fact, Defendants Roebuck and Breighner threatened First Float they would not transfer the lease - breaching the Buoyance Sale Docs - because these individuals Defendant Roebuck wanted to retain the ability to "shut down" the buyer's business at any time he chose.

j.    Among other things, Roebuck responded to First Float's request with a text message that "we can get your name only on the lease as soon as I am paid off in full." As this text message evidences, Roebuck breached the Buoyance Sale Docs and tortiously interfered with them by refusing to cooperate in transferring the lease as required by the Buoyance Sale Docs until certain conditions, that Roebuck had no right to insist upon, were met.

34.    Buoyance, Roebuck, and Breighner's failure to disclose all liabilities, false representations, refusal to reasonably cooperate with transferring the lease, and other related conduct, flagrantly and seemingly purposefully breached the Buoyance Sale Docs.

### Roebuck's criminal sabotage of the sale

35.    As First Float complained of the Buoyance sale rip-off, Roebuck and Breighner's approach shifted toward scorched earth and deflection.

36. On or about May 16, 2019, Roebuck showed up unannounced at First Float's spa and handed a letter to its Chief Marketing Officer, Tyler Johnson. According to Roebuck, Buoyance was on the lease and he was "evicting" First Float because First Float was late with its May 2019 *First Float Note* payment. Roebuck ordered First Float to vacate the building and cease operations. Johnson complied.

37. Roebuck then had First Float's locks changed, the security system administration put in his name, placing signs on the window stating that First Float was closed and that its clients and/or potential clients should call his cell phone for information. While he was there, Roebuck also unlawfully seized and converted certain personal property from First Float, taking it with him when he returned to Louisiana.

38. Notably, the payment Roebuck complained of, which was destined for GAT's account, was apparently made.

39. Having uncovered Roebuck and Breighner's sham in the Buoyance sale, and in the wake of their criminal activity in May 2019, First Float has not made a payment on the *First Float Note* since, Roebuck and Breighner have since acknowledged that they have no right to the personal property (which they now claim they took to "preserve" the property), and First Float has instigated North Carolina state court civil proceedings against Buoyance and its owners for their fraud.

40. It's now clear to everyone that Roebuck and Breighner's behavior came in apparent retaliation to First Float's discovery it had been sold a worthless business. And upon information and belief, Roebuck and Breighner controlled Buoyance regarding the actions and omissions detailed above so much that Buoyance had no separate mind, will, or existence of its own, more specifically:

    a.      Buoyance was inadequately capitalized;

    b.      Buoyance failed to comply with corporate formalities;

    c.      Roebuck and Breighner completely dominated and controlled Buoyance so it had no independent identity; and

    d.      Buoyance was not properly maintaining ordinary and necessary company records.

41.    Roebuck and Breighner used his control over Buoyance to act to further Roebuck and Breighner's overall conspiracy.

### The payments stop

42.    Meanwhile and with no explanation, Roebuck's "family attorney" Moretz unilaterally terminated his intermediary duties on April 8, 2019, "outing" the arrangement to First Float and directing that payments be directly made to Roebuck for May 2019.

43.    GAT wasn't paid in May 2019.

44.    And despite promising to enforce the *First Float Note* as though the *First Partial Assignment* hadn't happened, Buoyance and its owners did nothing but ensure GAT wouldn't be paid - by their criminal behavior in First Float's business in mid-May 2019.

45.    Meanwhile, Roebuck's Louisiana attorney made demand on First Float for the May 2019 payment, curiously requesting that it be sent to Buoyance.

46.    It is unknown whether the May 2019 payment was made, but GAT has not been paid since April 2019 and it is believed that First Float will no longer pay the *First Float Note* on the worthless business it was sold.

47.   At no point did Roebuck or Breighner indicate to GAT there were problems stemming from the sale that threatened its full consummation as it related to the *First Float Note.*

### The New Orleans business scheme;
### the "float conference" schemes

48.   The entire point of the *First and Second Partial Assignments* was to provide Roebuck and Breighner with capital to start their float spa business on Magazine Street in New Orleans.

49.   Indeed, the day after the sale of the North Carolina business to First Float, on February 1, 2018, Roebuck and Breighner organized First Float.

50.   And later in 2018, the two commenced to sell memberships and prepaid spa services in a non-existent float therapy spa in New Orleans, before even entering into a lease. They're still doing this, permits and physical space to perform be damned.[5]

51.   At least by mid-2018 and extending into 2020, Roebuck and Breighner advertised at least two sham therapeutic conferences, co-defendants Float Conference and ITFC.[6]

52.   Each of these proposed conference entities solicited and received services and money from various venues, suppliers, and public subscribers, using both mail and internet solicitations. No such conferences were ever held and the solicited funds were diverted to Roebuck and Breighner.

---

[5] https://www.flotnolashop.com/shop/SALE/5

[6] https://www.mapado.com/en/new-orleans/the-international-therapeutic-floatation-conference-1

### Roebuck's assurances

53.   In August 2019, after learning of the May 2019 "eviction" fiasco and a resulting civil suit in North Carolina, GAT sent Buoyance and Roebuck notices of default regarding its failure to protect GAT and Buoyance's rights under the *First Float Note*.

54.   Roebuck responded in writing he had hired an attorney and would litigate the matter in North Carolina:

> Great news!! My attorney there (in NC) is on my payroll, but he will be filing next week to collect all outstanding debt.

55.   Eventually, learned this was untrue and that Buoyance hadn't even filed an answer in the North Carolina litigation.

56.   In November 2019, GAT demanded Buoyance and its owners:

   a.   make payment on their arrearages under the *First and Second Partial Assignments*;

   b.   provide GAT with an update on various Civil District Court (Orleans Parish) litigation which suggested eviction from their Magazine Street lease;

   c.   provide GAT with a copy of the Magazine Street lease and any resulting consent judgments;

   d.   provide GAT with the whereabouts of the UCC collateral securing its *First and Second Partial Assignments*;

   e.   provide GAT with any lien documentation for other encumbrances on the collateral; and

   f.   provide GAT with an update on Roebuck's written promise that his North Carolina attorney would be "filing next week to collect all outstanding debt" [from First Float].

57.   Roebuck never answered and neither Roebuck nor Breighner ever informed GAT of the meaningful problems they were having with the First Float sale – or any of the

discoveries First Float had made or suggested in terms of the misrepresentations or fraud which appears to have permeated that sale.

### Float Nola's demise

58. Set out more fully in a related racketeering-based lawsuit [20-01472] brought in this Court by Float Nola's former landlord on Magazine, the New Orleans business was likely a sham itself.

59. Although Float Nola spent all of 2019 in and out of Court trying to avoid eviction for serious lease defaults, it still appears to have swindled some money out of online coupon purchasers on its way down.

60. For its part, GAT offered to extend the terms on the *First and Second Partial Advances* to help out. GAT also offered to consent to revise some faulty descriptions in the UCC it held (which was drafted by Roebuck/Buoyance's attorney) which was noticed as a tenant default.

61. Ultimately, Roebuck and Buoyance and their attorneys ignored GAT and, facing eviction, removed the UCC collateral securing the *First and Second Partial Advances*.[7]

62. GAT doesn't know where that equipment is but, in April 2020, Float Nola assumed its present name (it was Flot Nola LLC) and, upon information and belief, it appears intent on continuing its misdeeds.

---

[7] Float Nola recently took a devolutive appeal of the state court eviction order.

**Breighner's home**

63.   Upon information and belief, Buoyance and its owners were being infused with cash from all angles (including a buildout sum advanced by their Magazine Street land-lord) in 2018 and 2019, they weren't paying any of their creditors and, at the same time, Breighner in May 2018 purchased a $590,000 home ("Charlotte Drive Home") in New Orleans.[8]

64.   Upon information and belief, the sums advanced from GAT to Buoyance were de-posited into Breighner's account, or moved shortly after their deposit.

65.   Upon information and belief, Roebuck and Breighner are (and were when Breighner purchased the house) married and both live at the Charlotte Drive Home.

**Single business enterprise/group of companies/**
**solidary liability/veil piercing/joint enterprise theory**

66.   **Owner liability/veil-piercing.** Upon information and belief, Roebuck and Breighner so thoroughly controlled the other defendants (as Roebuck, Breighner, or both were the only managers or directors of each of the companies), those companies' corpo-rate or LLC identities should be disregarded under a veil-piercing theory because, upon information and belief, Breighner and Roebuck's control of EACH of those companies amounted to complete domination regarding the transaction(s) at issue (here, the Buoyance assets sale and the negotiation of the *First and Second Partial Assignments* and all the deceit which followed each, the owners' repeatedly used this control to commit a wrong, or to violate a statutory or other duty in contravention

---

[8]      http://qpublic9.qpublic.net/la_orleans_dis-play.php?KEY=6123-CHARLOTTEDR

of the other party's rights, and the wrong or breach of duty injured First Float, along the way, but more specifically GAT, a party, in this instance.

67. **Group of companies/single enterprise/joint enterprise theories.** Not only did Roebuck and Breighner's conduct permit the Court to disregard the corporate or LLC identity of the companies they used to accomplish their improper ends, but they used multiple companies interchangeably during the process.

68. Though its adoption under Louisiana law is somewhat questionable, under both North Carolina and Florida law, unrelated companies can be held liable for each other's torts where they performed related activities through a unified operation or common control for a common business purpose.

69. All the companies were used under the guise of science and therapy-backed sale of gift certificates and packages for service, all the companies were controlled by Roebuck, Breighner, or some combination thereof, all the companies operated during the same periods of time, and all the companies ultimately served as little more than a pass-through conduit (often involving Roebuck and Breighner's 11th-hour name change to throw off creditors or to permit new applications for funding or permitting) by which Roebuck and Breighner could collect money from the public seeking therapeutic services – all before closing shop and moving on.

70. Discovery into the now-dissolved North Carolina companies (Float Conference, Buoyance, The Roebuck Institute, Breighner Institute) will no doubt reveal a sad trail of broken promises and small-time hucksterism. Small as they are, though, the aggregate was bundled, along with the Buoyance assets sale and the resulting *First*

*Float Note*, to coerce GAT into advancing substantial money, which ultimately wound up in the hands of Roebuck and Breighner.

71.   For nearly all the allegations, the Court should consider all the defendants a single entity, controlled by a conspiring duo, commingling other people's money (here, GAT's) after defrauding them in a variety of manners.

## COUNT ONE:
## RESCISSION FOR FRAUD

72.   GAT incorporates by reference the allegations it made in ¶¶ 1-71, above, as though reproduced here *in extenso*.

73.   Buoyance and its owners Roebuck and Breighner so materially misrepresented their qualities as sellers and businesspeople, and so materially misrepresented the nature of the *First Float Note* and the underlying, mostly-fraudulent transaction, that it prevented GAT's decision-maker, who himself has decades of experience in this industry, from making an informed decision regarding the *First and Second Partial Assignments*.

74.   These defendants' misstatements, and silence in the face of a duty to speak, amount to fraud, and that fraud is of the sort that goes to the very essence of this contract. That is, GAT wouldn't have advanced these sums had it known of the true nature of Buoyance and its owners' dealings with the North Carolina buyer (First Float).

75.   Rescission should be granted as to the *First and Second Partial Assignments* and all defendants should be ordered to repay the sums GAT advanced to the defendants, less the value of any note stream payments made in satisfaction of the contract(s).

76. Delay damages under Civil Code article 2000, or any applicable North Carolina or Florida law, should be awarded, consisting of interest at the statutory rate calculated retroactively to the advances from GAT to defendants.

77. Compensatory damages and attorney's fees should be awarded under Louisiana Civil Code Article 1958, or any analog applicable under North Carolina or Florida law.

**COUNT TWO:**
**VIOLATION OF STATUTORY UNFAIR**
**AND DECEPTIVE TRADE PRACTICES PROHIBITIONS**

78. GAT incorporates by reference the allegations it made in ¶¶ 1-77, above, as though reproduced here *in extenso*.

79. Defendants' behavior so far transcends even bad faith, and so far deviates from acceptable business practices, and so fits fraud's mold, it violates every potentially-applicable affected state's (Florida, Louisiana, or North Carolina) public policy when it comes to protection of those who enter supposedly arms-length business transactions.

80. Though the statutes vary, they all feature enhanced damages and attorneys fees, all of which should be awarded under the circumstances.

81. To the extent required by statute, GAT will send a copy of this complaint to the various states' Attorneys General, as the case may be, to perfect its right to enhanced damages, investigation, or other relief.

## COUNT THREE:
## BAD FAITH BREACH OF CONTRACT

82. GAT incorporates by reference the allegations it made in ¶¶ 1-81, above, as though reproduced here *in extenso*.

83. In the alternative, if the Court refuses to award rescission, Buoyance, Roebuck, and Breighner should be cast, *in solido* or jointly-and-severally as the case may be, for their obvious, conspiratorial breach of the *First and Second Partial Assignments* by:

    a. sabotaging the relationship with the note maker First Float;

    b. refusing to make payments when First Float ceased doing so itself;

    c. permitting its intermediary to violate the assignment agreement and reveal GAT's identity and role;

    d. refusing to enforce the *First Float Note*;

    e. refusing to defend itself in the North Carolina litigation involving the *First Float Note*; and

    f. refusing to respond to GAT's request for status updates on the relationship with First Float, the North Carolina litigation with First Float, or anything at all since August 2019.

84. Because these defendants' breaches were made in bad faith, GAT's damages both foreseeable and not foreseeable should be awarded.

## COUNT FOUR:
## VIOLATION OF UNIFORM FRAUDULENT CONVEYANCE ACT
## AND/OR LOUISIANA REVOCATORY ACTION

85.    GAT incorporates by reference the allegations it made in ¶¶ 1-84, above, as though reproduced here *in extenso*.

86.    It seems unlikely that Buoyance has, in its bank account, the funds GAT advanced it, minus the payments made on the stream.

87.    Upon information and belief, Buoyance is insolvent and has caused or increased its insolvency by transferring its property and money to other defendants who have either moved the money to other defendants or to third parties, or have entered transactions and transformed any funds into other types of property.

88.    Likewise, Buoyance is believed to have transferred or liquidated its non-money property, increasing or causing its insolvency.

89.    Upon information and belief, the funds advanced by GAT were received by defendant Breighner.

90.    Upon information and belief, Buoyance and its principals have conducted themselves, as alleged in this Count Four, solely to deprive the growing list of their creditors from having any fair shot at collecting or enforcing judgments against them.

91.    This conduct violates both uniform fraudulent conveyance laws enacted in non-Louisiana states, and Louisiana's revocatory action principles, and permits many of these transactions to be undone.

92.    To the extent the funds GAT advanced were accepted by Breighner, all other defendants are rightly joined as potential third-party transferees as contemplated by Florida, North Carolina, and Louisiana (Civil Code Article 2042) law.

93.  To the extent the funds GAT advanced were accepted by Buoyance, all other defendants are rightly joined as potential third-party transferees as contemplated by Florida, North Carolina, and Louisiana (Civil Code Article 2042) law.

### COUNT FIVE:
### CONVERSION

94.  GAT incorporates by reference the allegations it made in ¶¶ 1-93, above, as though reproduced here *in extenso*.

95.  Upon information and belief, Buoyance made a written demand to First Float for the May 2019 installment on the *First Float Note*.

96.  To the extent Buoyance or any other defendant took delivery of that payment, it constitutes conversion because only GAT had a right to be paid those sums under the *First and Second Partial Assignments*.

97.  Upon information and belief, other payments were made from First Float to Buoyance or its principals, and any acceptance by the latter under the circumstances constitutes conversion.

98.  As a tort matter, Buoyance and the other defendants should be ordered to account and make restitution for the funds they converted, if any.

### COUNT SIX:
### TORTIOUS INTERFERENCE
### WITH BUSINESS RELATIONS OR CONTRACT

99.  GAT incorporates by reference the allegations it made in ¶¶ 1-98, above, as though reproduced here *in extenso*.

100. Defendants Roebuck and Breighner completely controlled Buoyance, which was a party to the *First and Second Partial Assignments* and the *First Float Note*.

101. Roebuck and Breighner purposefully sabotaged all aspects of both agreements, and they caused Buoyance to fail in every performance duty in these contracts.

102. There were no commercially-reasonable justifications for Roebuck and Breighner's behavior, and it can only be concluded that their motivations were tortious and were intent to cause serious damage to every business involved in these agreements.

103. These actions have had dire consequences for GAT, and these defendants should be ordered to pay the resulting damages GAT has suffered.

**COUNT SEVEN:**
**BREACH OF FIDUCIARY DUT(IES)**

104. GAT incorporates by reference the allegations it made in ¶¶ 1-103, above, as though reproduced here *in extenso*.

105. Under the *First and Second Partial Assignments* and all resulting circumstances, Roebuck and Breighner owed GAT a fiduciary duty, not the least of which was to be open about the prospect of being paid on the *First Float Notes*. They also owed duties to keep Buoyance in the note maker's good graces and to not disclose that Buoyance had "already been paid" on the *First Float Note*, and that some third-party Florida banker owned the rights now.

106. These defendants also owed GAT a duty to enforce the *First Float Notes*.

107. Rather than discharging these duties, these defendants openly lied to GAT, sabotaged Buoyance's relationship with First Float by open criminal activity at its place of business, employed a scorched-earth approach toward the credit facility, and have failed to rehabilitate the relationship with First Float so GAT stands any chance of being paid.

## COUNT EIGHT:
## ENRICHMENT WITHOUT CAUSE

108. GAT incorporates by reference the allegations it made in ¶¶ 1-107, above, as though reproduced here *in extenso*.

109. Because these defendants, *in solido* and as a single, commingling, quasi-criminal conspiratorial, single entity, have been enriched, and because GAT has been impoverished in a corresponding manner, and because there is no just reason, and where the Court finds there to be no other remedy at law, the Court should award GAT damages to rectify the imbalance according to applicable law.

Wherefore, Martin S. Granoff, as Trustee of the Granoff Acquisition Trust, requests that his allegations be deemed good and sufficient, that this *Complaint* be assigned a cause number, section, and division, and that after all legal delays and proceedings are had, the Court grant relief in its favor, and against the defendants, for all relief allowable, whether contractual, legal, equitable, or customary, including without limitation costs under Fed. R. Civ. P. 54(d).

Respectfully submitted,

*/s/ Andrew T. Lilly*
**Andrew T. Lilly (La. 32559)**
4907 Magazine Street
New Orleans, Louisiana 70115
t: (504) 812-6388
f: (504) 539-4180
e: andrew@atlpllc.com

*Attorney for plaintiff Martin S. Granoff, individually and as trustee of the Granoff Acquisition Trust*